REGAN, Judge.
Plaintiffs, William France and Eves J. Savoie, Jr., conducting their business under the trade name of France & Savoie Ceramic Tile Contractors, instituted this suit against the defendants, William and Victoria Osborn, the home owners, Robert D. Gibbens, their general contractor, conducting his business under the trade name of Gibbens Construction Company, and the contractor’s surety, New Amsterdam Casualty Company, •endeavoring to recover the sum of $2,418.25, representing the unpaid balance due plaintiffs for laying a tile floor in the Osborn residence at 3219 Jefferson Avenue in the City of New Orleans. Plaintiffs further requested that a duly recorded subcontractor’s lien against the Osborn property be recognized.
Defendants Gibbens and New Amsterdam Casualty Company answered and admitted the contract of suretyship between them and generally denied all other allegations of plaintiffs’ petition.
Defendants, William and Victoria Osborn, pleaded the exception of no cause of action, asserting that plaintiffs’ remedy, if any, should be in the nature of a suit against the general contractor and his bondsman, and not against the owners of the residence. Alternatively, they insisted that the tile was not laid in a workmanlike manner, which vitiated the contract upon which this suit is predicated.
Then, assuming the role of third-party plaintiffs, the Osborns asserted that their co-defendants, the general contractor and his surety, were liable to them for any amount for which they might be cast in judgment on the main demand, and further instituted a claim for $342, representing liquidated damages specified in the building contract, arising from the contractor’s failure to complete their home within the time limit designated by the contract.[1]
Defendant Gibbens, likewise, initiated a third-party action against the Osborns, in which he demanded indemnification for any amount which he might be cast in judgment on the original demand by plaintiffs. He asserted that the tile work was completed in accordance with the specifications set forth by the Osborns’ architect, Patrick M. Allison.
From a judgment in favor of plaintiffs for $2,418.25 against Gibbens and his surety, which also maintained the Osborns’ exception of no cause of action, Gibbens and his surety have appealed. From a judgment in favor of third-party plaintiffs, Gibbens and *566 New Amsterdam Casualty Company[2] and against the Osborns for $2,418.25, they have appealed.
Chronologically stated, the pertinent facts from which this litigation developed are these:
Defendants William and Victoria Osborn engaged Patrick M. Allison, an architect, to design a residence, which they subsequently erected at 3219 Jefferson Avenue. One of the specifications in the architect’s plan provided :
“First Floor Other Than Bath and Kitchen.
“Including hall and closets to be Sparta Ceramic Quarry Tile 6" x 6" x \dark gray (with carbon specks) laid diagonal, close as possible, maximum 14" apart.” (Emphasis added.)
Gibbens the contractor, entered into an agreement with the plaintiffs to install the first floor tiling for the sum of $3,904,[3] which is evidenced by a letter dated April 20, 1956.
On May 5, 1956, plaintiffs’ agent, Charles Makofsky, met the Osborns at the Romany-Spartan Tile Company for the purpose of selecting the tile to be used on the job, since the type originally specified by the architect was not available at the time. In conformity with the advice of Makofsky, the Os-borns agreed to have the tile laid in a broken joint pattern rather than in a diagonal pattern as originally planned by the architect on the theory that the floor would possess a better appearance. The tile manufacturer’s representative, Rodger Beigert, warned the Osborns that the width of the joint specified by their architect was too narrow for the tile they had selected and incorporated this caution on the selection order form:
“6x6 Orson Beige Porcis for downstairs, including hall & closets (setting) close as possible maximum joint requested J4"- This joint not approved by manufacturer. * * * ”
On May 20, 1956, plaintiffs sent a letter to the general contractor, wherein they confirmed the tile selection and a side agreement with the Osborns to install ceramic fixtures in two bathrooms at an additional charge of $14.25. The change in pattern was approved by the architect since the owners had accepted it.
During November of 1956 the floor was laid with approximately a %3" joint between the tiles. As the floor was being installed, Mrs. Osborn frequently visited the construction site and even commented that the tile work looked “fine” upon seeing the completed job before the grouting was applied to fill the joints between the tiles. After the joints were filled, both Mr. and Mrs. Osborn inspected the floor and, noticing its unevenness, called upon their architect to inspect it.
On November 29, 1956, Allison notified the general contractor that the tile work was unsatisfactory; therefore, the entire floor would have to be removed and relaid.
During December of 1956, Gibbens had the tile floors ground to remove the unevenness of the surface. Although Allison did not approve of the grinding, the Osborns apparently assented to it, although both denied this when they testified. After the floors were ground, Allison reinspected it and again rejected it.
On December 27, 1956, Allison sent a telegram to Gibbens, wherein he formally re *567 jected the job and advised that he intended to employ another tile contractor to tear out the faulty flooring and replace it properly.
On January 3, 1957, Gibbens’ attorney wrote a letter to Allison and the Osborns, cautioning them that they would be inviting litigation should they tear up the floor without affording the plaintiffs’ an opportunity to arbitrate.
Several days later, George Riehl, an architect employed by Gibbens, inspected the tile flooring, which had already been ground, and was of the opinion that the floor was very acceptable. He did recommend that a few minor alterations should be made to perfect its appearance and he was unable to state whether the color was affected by the grinding process as he had not seen it prior to grinding.
Shortly thereafter, the George L. Ducros Tile Company removed the floor installed by plaintiffs and replaced it at the Osborns’ request, using a diagonal joint pattern with joints of Y" width. This work was done for the price of $2,781.
It is generally agreed by all the experts who testified that the floor was uneven primarily because the width of the joints was insufficient. George Riehl pointed out that the American Institute of Architecture recommends a joint measuring a minimum of between ]/.and Y" so that the grouting in the joints will take care of the natural warpage of the tile and give it an even appearance. Biegert, the manufacturer’s representative, said the recommended width was between Y" and Y" minimum, which he pointed out to the Osborns when they selected the tile.
Plaintiffs, in following the specifications which required that the tiles be set as close as possible, left a %6" joint, and the experts agreed that the natural warpage of the tiles was accentuated by such a close setting.
There is considerable testimony in the record concerning the effect of grinding the floor, which we will not set forth in detail in view of the result we have decided should be reached herein.
The only question posed for our consideration by virtue of this appeal is whether the uneven floor resulted through plaintiffs’ poor workmanship or through the architect’s faulty specifications.
The trial judge, in written reasons for judgment, stated:
“a.) That plaintiff subcontractors substantially completed all the work required of them by their contract in a suitable and workmanlike manner and in accordance with the plans and specifications as amended.
“b.) That if anything was wrong with the appearance of the job, same was not due to any fault or failure of the subcontractor but was due to improper specifications.”
Counsel for defendants, Mr. and Mrs. Osborn, insists that the trial judge erred in concluding that the defective flooring resulted from faulty specifications and argues that the subcontractors should have foreseen the result and cautioned the Osborns.
We think the record fully supports concluding that the Osborns were forewarned. Their architect stated he was aware of the fact that the joints should have been a minimum of Y to Y inches wide, but the specifications called for the tiles being set as close as possible with a maximum of Y inch in between because “ * * * it was the owner who wanted a little bit less than one-quarter inch”.
The Osborns were fully cognizant of the fact that the joints required by the specifications were narrower than those recommended by the manufacturer; therefore, it would be unreasonable to conclude that no circumstance occurred that might possibly forewarn them of a potentially unsatisfactory job. In setting the tile, the subcontractor followed the architect’s specifications to the letter by setting them as close as possible. We do not believe that the disputed clause *568 in the contract should be interpreted to mean that the architect specified a Y4' joint, in view of the language of the clause.
Therefore, we are compelled to conclude that the trial judge’s finding of fact is correct.
In rendering judgment, the lower court recognized a lien against the Osborn residence at 3219 Jefferson Avenue; however, in oral argument, all litigants agreed this was improper in view of the fact that the general contractor had furnished a bond specifically to prevent the filing of any laborers or materialmens liens against the property.
For the reasons assigned, the judgment appealed from is reversed insofar as it recognized a subcontractor’s lien against the premises, 3419 Jefferson Avenue, and in all other respects, the judgment is affirmed.
Reversed in part, affirmed in part.

. This claim was dismissed as of voluntary non-suit during the course of the trial below.

. The judgment specifically reserved the right of the contractor and his surety to assert any claim for “additional sums due them under the building contract”. This was done because the Osborns withheld payment of $2,781 in paying Gibbens the contract price, which sum represented the Osborns’ cost to have the tile floor torn up and replaced by another contractor.

. Plaintiffs’ original contract and the extras totaled $3,918.25, and they received $1,500 from the Osborns before starting the job.